**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0719n.06

**Case No. 19-2121**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Dec 28, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| WILLIE WIMBERLY, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| JACK KOWALSKI, Warden, | ) | |
| | ) | **OPINION** |
| Respondent-Appellee. | ) | |

BEFORE: DAUGHTREY, NALBANDIAN, and MURPHY, Circuit Judges

NALBANDIAN, Circuit Judge. A jury convicted Willie Wimberly of two counts of assault with intent to commit murder after the passengers in a vehicle he was driving shot several rounds into another vehicle. He sought habeas relief from that conviction in district court, claiming his attorney's performance was constitutionally deficient. The district court denied his petition. We **AFFIRM**.

I.

Early in the morning of January 1, 2013, Brandon Charles and Seylon Dudley left Detroit's MGM Grand Casino in a black Range Rover. Around the same time, Willie Wimberly also left the casino driving a black Ford Expedition with two passengers. As Charles and Seylon were leaving, the Ford cut them off at an intersection just outside the casino. Charles swerved around the Ford and turned onto the northbound onramp of M-10. The Ford followed. When the Ford

caught up, Charles rolled down a window, made faces at the other vehicle, and displayed a wad of cash.

Charles then turned onto I-94. And once again, the Ford followed and pulled up alongside the Range Rover. But this time, the passengers in the Ford peppered the side of the Range Rover with multiple gunshots, injuring Charles and Dudley. Charles and Dudley both survived, but that is not the end of the story.

Following the shooting, police arrested Wimberly. Charles was slated to testify at a preliminary examination. Wimberly did not want Charles to testify, so he reached out to Avantis Parker, a mutual acquaintance, to see if Charles would accept a bribe. *People v. Wimberly*, No. 322923, 2016 WL 1673091, at *1 (Mich. Ct. App. Apr. 26, 2016). But when that did not work out, Wimberly arranged to have Charles killed. *Id.* And the night before the preliminary examination, Avantis Parker, Terrence Parker, and Lawrence Matthews met Charles at his residence, where Terrence Parker shot him. Avantis Parker later pled guilty to second-degree murder for his involvement in Charles's death. And the state charged Wimberly with murder and related crimes in separate criminal proceedings that are not the subject of this appeal. *See id.*

Before Wimberly's trial arising out of the road-rage incident, which is at issue here, the trial court ruled that Avantis Parker could testify about Wimberly's attempt to bribe Charles, but not about Wimberly's involvement in Charles's murder. In his opening statement, however, Wimberly's attorney opened the door to evidence of Wimberly's involvement in the murder. This allowed the prosecution to present evidence showing that Charles's murder was motivated by a desire to prevent him from testifying. The attorney did so by trying to argue that Avantis Parker, not Wimberly, should have been the suspect in the road-rage shooting because Avantis Parker had an ongoing "drug dealing relationship" with Charles and was "the man who killed Brandon

2

Charles." (R. 5-9, PageID 751.) In short, he claimed that the "prosecutor would not be able to prove that the gunshots were fired from the same vehicle that cut off the Range Rover outside the casino." *People v. Wimberly*, No. 321490, 2015 WL 6161545, *9 (Mich. Ct. App. Oct. 20, 2015). And in the alternative, he argued that the prosecution could not "show that [the] defendant did anything more than drive the vehicle." *Id.*

Against the advice of counsel, Wimberly chose to testify at trial. Unhappy with his attorney's trial strategy, he felt "compelled to admit that what his attorney had said in opening statement was not true." (Appellant Br. at 38.) And he admitted that he was driving the vehicle involved in the shooting, undermining his attorney's suggestion that the prosecution could not prove that the shots came from the Ford beyond a reasonable doubt.

Given Wimberly's concession, his attorney pivoted away from the initial strategy and made a closing argument that aligned with Wimberly's testimony. There, he explained that Wimberly could have declined to testify and held the prosecution to the burden of proof. But he argued that Wimberly was uncomfortable withholding the truth from the jury.

The jury convicted Wimberly of aiding or abetting in the assaults of Charles and Dudley. The Michigan Court of Appeals affirmed, and the Michigan Supreme Court denied leave to appeal. Wimberly then filed a habeas petition in federal district court. The district court denied his request for habeas relief but granted a certificate of appealability on two ineffective-assistance claims—whether Wimberly's attorney was ineffective for failing to investigate the case and confer with him about strategy, and whether the attorney's decision to open the door to testimony about Wimberly's involvement in Charles's murder was constitutionally deficient.

II.

To prevail on a claim for ineffective assistance, "the defendant must show that counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Surmounting *Strickland*'s high bar is never an easy task" though, *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), because courts' review of counsel's performance is "highly deferential," *Strickland*, 466 U.S. at 689. And courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

Although *Strickland* is a lofty hurdle in isolation, defendants face an even higher bar when raising *Strickland* in the 28 U.S.C. § 2254 context. "The question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citation omitted). Further, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.* In sum, a "doubly deferential" standard applies. *Id.* And both of Wimberly's claims fail under this "doubly deferential" standard.

Wimberly first asserts that his attorney's performance was deficient because he failed to investigate the facts of the case and consult with Wimberly about trial strategy. In support of this assertion, he claims that "counsel made an opening statement wholly at odds with the easily discoverable facts." (Appellant Br. at 24.) And he claims that the opening statement shows that his attorney was unaware of a favorable pretrial ruling and deprived him of the benefit of that ruling. He also points to his statement in court claiming he had not seen his attorney to plan his defense. And he finally says that "at sentencing [his] attorney . . . admitted that there had been a

total breakdown between himself and [Wimberly] as to strategy." (*Id.* at 38.) But because there is ample record evidence contradicting his arguments, he fails to show that the Michigan Court of Appeals' rejection of his claim was unreasonable.

Of course, Wimberly is correct that an attorney has a duty to "consult with the defendant on important decisions and to keep the defendant informed of important developments." *Strickland*, 466 U.S. at 688. But Wimberly admitted that his attorney had consulted with him when he sought to substitute in a different attorney, telling the court that his attorney "[n]ever let[s] me talk when he . . . comes to visit me. Bad listening skills. He wants to be the client and the attorney, basically the pilot and the co-pilot." (R. 5-7, PageID 497.) So the problem was not lack of consultation; it was that Wimberly disagreed with his attorney's strategy and felt he was not being allowed to control his case. His attorney's statement at sentencing confirms this conclusion, when the attorney voiced his frustration with his client and admitted they "ha[d] not agreed on strategy." (R. 5-16, PageID 1452.) And although Wimberly's frustration with his attorney's decision to pursue a different strategy is perhaps understandable, most matters of strategy are entrusted to counsel, not the defendant. *See Gonzalez v. United States*, 553 U.S. 242, 248 (2008) ("[D]ecisions by counsel are generally given effect as to what arguments to pursue . . . ." (citation omitted)). So the mere fact that the attorney pursued a strategy other than the one Wimberly thought was best does not show ineffective assistance. And it certainly fails to show that the Michigan court's decision to deny the ineffective-assistance claim was unreasonable.

Moreover, the attorney's opening statement does not reveal that he misunderstood the facts of the case. Wimberly claims that his attorney's argument—that the prosecution could not prove that Wimberly was driving the car involved in the shooting—reveals that the attorney was ignorant of evidence showing that Wimberly was driving the Ford. But in his opening statement, the

attorney did not claim that Wimberly was not driving the Ford that cut off Charles and Dudley outside the casino; he admitted it. He just argued that there was no evidence to prove that the Ford was the car involved in the shooting. He also argued that "[e]ven if the government were able to establish that the vehicle from which these bullets were shot was the same vehicle that had this confrontation at the [casino], the one that was driven by Willie Wimberly," the government would still need to prove that Wimberly "did something more than just drive that vehicle." (R. 5-9, PageID 743.) That Wimberly later undermined the former argument when he admitted presence at the shooting does not establish that Wimberly's counsel was unaware of the facts of the case or pursued an unreasonable trial strategy. Indeed, Wimberly admits that it is ordinarily a valid trial strategy to argue that the prosecution will not be able to carry its burden of proof.

Wimberly also claims that the opening statement revealed that his attorney did not know about the court's ruling that evidence of Wimberly's involvement in Charles's murder was not admissible. But the prosecutor stated that she informed him of the ruling when he was retained and "[a]t that time, he indicated . . . that he wanted to bring in the fact that [Parker] was charged with the murder." (R. 5-10, PageID 814.) And the colloquy about whether the opening statement opened the door supports this statement. There, the attorney did not say that he was unaware of the ruling. Rather, he explained that he was not the attorney at the time of the ruling, but then began to explain his "understanding" of that ruling before the court cut him off. (R 5-9, PageID 755.) He then voiced his opinion that he should be allowed to bring out the "tremendous bias" of Avantis Parker in his case but disputed whether this had opened the door to evidence of Wimberly's involvement in the murder. (*Id.* at 756.) He did, however, acknowledge that if he asked Parker about the murder on cross, then the door would be open. So Wimberly's assertion that his attorney did not know about the prior ruling fails.

Wimberly also asks us to second-guess the Michigan Court of Appeals' conclusion that his attorney's decision to open the door to testimony about Wimberly's involvement in Charles's murder was not constitutionally deficient. As that court explained, Wimberly argued that opening the door to Charles's murder was ineffective because it led "to the consciousness-of-guilt instruction." *Wimberly*, 2015 WL 6161545, at \*10.[1] But that court rejected his claim because "the record discloses that regardless of defense counsel's opening statement, the prosecutor intended to use Parker's testimony to establish, at a minimum, defendant's involvement in trying to bribe Charles to keep him from testifying against defendant." *Id.* And "[t]hat evidence alone would have supported a consciousness-of-guilt instruction." *Id.* It also noted that "it is apparent from defense counsel's opening statement that he wanted to show Parker's involvement in Charles's murder to further attack his credibility." *Id.* And it held that the decision to open the door "was clearly a matter of trial strategy" and Wimberly had failed to show that decision was unreasonable. *Id.*

Wimberly does not directly attack the Michigan appellate court's reasoning. Rather, he claims that the only types of "strategic" decisions that are "entitled to deference" are those that "have been preceded by reasonable consultation with the client and reasonable investigation of the facts of the case." (Appellant Br. at 52.) And he concedes that "had [his] attorney . . . properly consulted with [him], and investigated the basic predicate facts of the events at the Casino, [the attorney's] decisions regarding opening statements might be 'virtually unchallengeable.'" (*Id.* at 51.) So as briefed, his second claim hinges on whether his attorney failed to consult with him and investigate the basic facts of the case. But even if Wimberly is correct that consultation and

---

[1] In Michigan, a jury is entitled to infer "consciousness of guilt from evidence that a defendant threatened or bribed a witness." *Id.* at \*4 (citing *People v. Sholl*, 556 N.W.2d 851, 856 (Mich. 1996); *People v. Mock*, 310 N.W.2d 390, 392 (Mich. App. 1981)).

investigation are prerequisite to deferring to counsel's decisions as "strategic," there is ample record evidence undercutting his assertions about consultation and investigation. So his argument fails on its own terms. And because he does not otherwise directly attack the Michigan appellate court's reasoning, he has failed to show that court's decision was unreasonable.

Because Wimberly has failed to undermine the Michigan Court of Appeals' decision under the "doubly deferential" standard of review that applies, we **AFFIRM** the denial of his habeas petition.